THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES E. WYNN, Jr., DEFENDANT-APPELLANT.

Argued February 20, 1956—Decided March 26, 1956.

*Mr. Harry L. Shure* argued the cause for the appellant.

*Mr. John W. Applegate,* Assistant Prosecutor of the Pleas, argued the cause for the respondent (*Mr. Vincent P. Keuper,* Prosecutor of the Pleas, attorney).

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from a conviction of murder in the first degree without recommendation of life imprisonment entered after a trial before a jury in the Monmouth County Court. The appellant appeals as a matter of right, *Art. VI, Sec. V, par. 1(c), Const.* 1948; *R. R.* 1:2–1(c).

The appellant was indicted for murder under *N. J. S.* 2A:113–1. The indictment is in the usual short form, *R. R.* 3:4–3(b), formerly *R. S.* 2:188–11. The proof of the *corpus delicti* indicated a particularly brutal murder. The autopsy disclosed that the deceased died of a severe brain injury resulting from skull fractures and concussion, together with very severe bruises and contusions around the neck with the tissues badly mashed in those areas. Pictorial exhibits evidenced that the deceased had been brutally beaten about the head.

In a confession which is corroborated in important details by other evidence, see *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Cole,* 136 *N. J. L.* 606, 610 (*E. & A.* 1948), and the cases cited there, the appellant related in detail his activities in the early part of the evening in question, which was July 10, 1955. He stated that he had visited a number of bars and did considerable drinking, and finally at 2 o'clock in the morning he hired a taxicab at the corner of Cookman and Main Streets, Asbury Park, to go to Long Branch. When they reached Deal he asked the deceased, the driver, "to pull off from the road and let me go to the bathroom." When he got outside of the cab he said he then demanded money of the driver who said he did not have any, and then he struck the deceased cab driver, pulled him out of the cab, struck him again, and when he fell to the ground the defendant kicked him several times. He stated then that he took the driver's wallet containing $4 and some change and also his watch and a jacket from the rear seat of the cab.

In the confession these specific questions and answers are found:

"Q. After you removed this watch from the taxicab driver's arm, what did you do with it?

A. I put it in my pocket.

Q. Who removed it from your pocket?

A. The police officer that arrested me.

Q. Now, Wynn, when you say you had an argument with the taxi driver, you meant that you went to hold him up and asked him for his money, and he resisted you, is that it?

A. Yes, sir.

Q. Had you hit the taxi driver with anything beside your hand and your feet?"

A. No, that is, I don't think so."

He then got in the cab and drove it away. In driving around he finally drove into a dead end street in Deal, where he got out and started to walk toward Asbury Park when he was picked up by the police.

At the trial he enlarged considerably his testimony as to his drinking activities and claimed he did not kill Hagerman, but testified that he had an argument with the deceased about a rebate or refund of the taxi fare. He claimed he had told the driver to take him to Long Branch, wait while he visited a friend, and then return him to Asbury Park but at the point when they stopped in Deal he changed his mind about going to Long Branch and asked the cab driver to take him back to Asbury Park and asked him if he would give him a refund of the money back as the agreement was he would pay $10 for the trip over to Long Branch and back.

He then testified that the deceased said a bargain was a bargain and would give none of the money back and that they got into an argument during which the cab driver said "Why, you black son of a bitch, you walk now," that he reached into the cab, struck the deceased and pulled him out of the cab and they started fighting. He said that he kicked him once and then tried to get away but that the deceased grabbed him around the knees, at which time he kicked him again. He then testified that the deceased's wrist watch came off his arm and he flung it away, not knowing where. He also stated that the deceased's wallet popped out of his pocket during the scuffle and that he, the appellant, took

the wallet with the contents, figuring that was what the deceased owed him from the $10, and that he then got into the cab of the deceased, the deceased got to his feet and yelled at him not to take the cab but nevertheless he drove off. He said that later when he was stalled on the dead end street he noticed the watch of the deceased on the seat where it presumably happened to land when he flung it away during the struggle and that he took the jacket from the car not realizing it did not belong to him.

We deem this short statement of the proofs before the court to be sufficient for present purposes, but our review of the entire record discloses considerable other proof bearing upon the death or murder of the deceased, all of which was properly evidential. We have likewise examined in its entirety the charge delivered by the trial court and we have reached the conclusion from a review of the entire record that the defendant suffered manifest wrong or injury in that charge, *R. R.* 1:5–1.

The trial court submitted the case to the jury on the theory of a killing occurring during the commission of a robbery which he defined in the terms of the statute *N. J. S.* 2*A*:113–2. He likewise defined the crime of robbery, but we find the following excerpts from the charge to be contradictory and confusing:

"The State contends that it has shown this beyond a reasonable doubt; that Mr. Hagerman's death was either due to blows or to the kicks or as a result of his having been knocked down. The State must show beyond a reasonable doubt that the death occurred from the trauma inflicted upon the decedent by the defendant. It is incumbent upon the State to show beyond a reasonable doubt that Hagerman's death was the result of the defendant's acts. In other words, it is incumbent to prove beyond a reasonable doubt that the defendant killed Mr. Hagerman in the perpetration of a robbery; and if the State has proved this to you beyond a reasonable doubt, then it is murder in the first degree. In other words, you will ask yourselves, was there a robbery, if your answer is yes, was there a homicide inflicted upon Mr. Hagerman by this defendant and has the State shown both of those things beyond a reasonable doubt and if you come to that conclusion, then it is murder in the first degree.

\*          \*          \*          \*          \*          \*          \*          \*

Our statute provides that if you find the defendant guilty of murder you shall designate by your verdict whether it be murder in the first degree or in the second degree. The theory under which the case has been tried is that a murder has been committed in the perpetration of a robbery. Therefore, if under the evidence Wynn , is guilty at all, he is guilty of murder in the first degree. So that, while you may return a verdict of guilty of murder in the second degree, such a verdict would be inconsistent with the theory upon which this case has been tried.

\*      \*      \*      \*      \*      \*      .  \*      \*

Whether or not you make the recommendation of life imprisonment rests entirely and fully in your judgment and in your discretion after the consideration of all the evidence bearing on the guilt or innocence of the accused. You may also return a verdict of guilty of murder in the second degree. I have spoken to you about this heretofore and it is by statute only that such a verdict can be returned in this case, and is wholly inconsistent with the theory upon which the case has been tried. In the event that you find that the State has failed to show beyond a reasonable doubt the guilt of this defendant, then your verdict will be not guilty. So there are any one of four verdicts which you may return; guilty of murder in the first degree, guilty of murder in the first degree with a recommendation of life imprisonment, guilty of murder in the second degree or not guilty."

The examination of these excerpts from the entire charge leaves us with the definite impression that we are unable to determine just what the jury understood by these conflicting instructions. When the court said

"Therefore, if under the evidence Wynn is guilty at all he is guilty of murder in the first degree. So that, while you may return a verdict of guilty of murder in the second degree, such a verdict would be inconsistent with the theory upon which this case has been tried,"

such remarks were approximately a direction to convict of murder in the first degree. Such error has been condemned by the court of last resort in this state. *State v. Jefferson,* 139 *N. J. L.* 308 (*E. & A.* 1942); *cf. State v. Jefferson,* 131 *N. J. L.* 70 (*E. & A.* 1943); *State v. Swan,* 130 *N. J. L.* 372 (*E. & A.* 1943). *Cf. State v. Swan,* 131 *N. J. L.* 67 (*E. & A.* 1943).

We agree with the trial court that there was proof before the court and submitted to the jury which, if believed, could justify a verdict of murder in the first degree

on the theory of a killing occurring during the commission of a robbery. *Stale v. Mule,* 114 *N. J. L.* 384 (*E. & A.* 1935). But there was likewise proof before the court, if believed, from which the jury could have concluded that the appellant was guilty of a willful, deliberate and premeditated murder, *State v. Bonofiglio,* 67 *N. J. L.* 239 (*E. & A.* 1901).

The court confused murder in the second degree with willful, deliberate and premeditated murder without charging the elements of the latter. There was likewise proof before the court which, if believed by the jury, might justify a verdict of guilty of murder in the second degree. *State v. Biango,* 75 *N. J. L.* 284 (*Sup. Ct.* 1907), affirmed 79 *N. J. L.* 523 (*E. & A.* 1909); *State v. Mangino,* 108 *N. J. L.* 475, 478 (*E. & A.* 1931); *Stale v. Corrado,* 113 *N. J. L.* 53, 59 (*E. & A.* 1934). The fact of killing being established, the presumption is that it is murder in the second degree. *Wilson v. State,* 60 *N. J. L.* 171 (*E. & A.* 1897); *Brown v. State,* 62 *N. J. L.* 666, 713 (*E. & A.* 1899). The intent to take life is not a necessary element required to constitute the crime of murder in the second degree. The intent to do grievous bodily harm is sufficient. *State v. Moynihan,* 93 *N. J. L.* 253 (*E. & A.* 1919). Finally, the killing of another in a passion of hot blood with reasonable provocation comprises the crime of manslaughter. *State v. Zellers,* 7 *N. J. L.* 220, 223 (*Sup. Ct.* 1824). To mitigate the offense to manslaughter, the facts must show that the homicide resulted from passion or the heat of blood upon a reasonable provocation. The provocation must be of such a character and so close to the act of killing that for the moment the accused could be considered as not the master of his own understanding. If such an interval of time elapses between the provocation and the act of killing as is reasonably sufficient for reason to resume its sway, it is not mitigated to manslaughter. *Brown v. State, supra,* p. 713.

We are aware that instructions by trial courts that a verdict should be either guilty of murder in the first

degree or acquittal have been approved on appeal in some cases. *Roesel v. State*, 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Pulley*, 82 *N. J. L.* 579, 582 (*E. & A.* 1912); *State v. Merra*, 103 *N. J. L.* 361, 367 (*E. & A.* 1927), but in those cases there was no evidence that could justify a verdict of guilty other than murder in the first degree. As we have pointed out, the trial court here merely referred to the other degrees of murder *eo nomine* without defining the determinative and constituent elements of each. Thus the jury was left without the legal implements to reach and form a verdict. The charge was contradictory and confusing in parts and a jury cannot and should not be required to determine what part of a contradictory charge is correct. *State v. Sahazian*, 98 *N. J. L.* 430 (*Sup. Ct.* 1923); *State v. Albertalli*, 112 *A.* 724 (*Sup. Ct.* 1915). Where the life of an accused is at stake, it is too risky to determine what the instructions in this case could mean to the twelve lay minds of the jurors.

For these reasons the conviction of the appellant must be reversed and a new trial ordered. Such disposition makes it unnecessary to discuss or decide the other points raised by the appellant.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.